IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **ENRIQUE BERNAOLA**, *Individually and on behalf of the Checksmart Financial 401(k) Plan* | Case No. 2:16-cv-684 |
| Plaintiff, | **Judge Graham** |
| v. | **Magistrate Judge Deavers** |
| **CHECKSMART FINANCIAL LLC,** et al., | |
| Defendants. | |

## OPINION & ORDER

Defendants Checksmart Financial LLC, Checksmart Financial LLC Plan Committee, and Pagle Helterbrand (the "Checksmart Defendants") move to dismiss Plaintiff's Amended Complaint, (Checksmart Defs.' Mot. Dismiss, Doc. 38), and move for summary judgment, (Doc. 50). Defendant Cetera Advisor Networks, LLC's does likewise, (Cetera's Mot. Dismiss, Doc. 39; Cetera's Mot. Summ. J., (Doc. 51)). This combination of motions is the result of the Court's earlier order permitting a limited scope of discovery on one issue, converting part of the motions to dismiss to motions for summary judgment. (*See* Order, Doc. 48).

**I. Factual Background**

Plaintiff, Enrique Bernaola is a participant in a retirement plan for employees of Checksmart Financial, LLC ("Checksmart"). (Am. Compl. at ¶ 7). Bernaola, displeased with the retirement plan's returns and fees, sued all those who might be responsible, and he did so on his own behalf and on behalf of the Checksmart Financial 401(k) plan (the "Checksmart Plan") itself. In short, Bernaola alleges that all Defendants breached certain fiduciary duties imposed by the Employee Retirement Income Security Act of 1974 ("ERISA"). *See* 29 U.S.C. §§ 1001, et seq.

Bernaola alleges that the following parties (collectively, "Defendants") breached their fiduciary duties to the Checksmart Plan and Bernaola as a participant: (1) Checksmart, the

1

Checksmart Plan sponsor and administrator, designated fiduciary of the Checksmart Plan, and a fiduciary under ERISA pursuant to 29 U.S.C. §§ 1002, 1102, (Am. Compl. at ¶ 8); (2) Checksmart Financial LLC Plan Committee (the "Checksmart Plan Committee"), a named fiduciary under the Checksmart Plan, a fiduciary under ERISA, and an administrator of the Checksmart Plan, (*Id.* at ¶ 9); (3) Pagle Helterbrand, the only member of the Checksmart Plan Committee and a fiduciary of the Checksmart Plan, (*Id.* at ¶ 10); and (4) Cetera Advisor Networks, LLC, a co-fiduciary of the Checksmart Plan that provides investment advice to the plan administrator, (*Id.* at ¶ 11). On a party-organization note, Defendants Checksmart, the Checksmart Plan, and Helterbrand have the same lawyers and filed their motion together. Defendant Cetera proceeds with separate counsel. For purposes of this discussion, the Court refers to Defendants' arguments collectively unless otherwise indicated.

The Checksmart Plan is a 401(k) plan that, as of April 2015, had over 1,700 participants and more than $25 million in assets. (*Id.* at ¶ 7). The Checksmart Plan permits its participants to direct their retirement funds as they wish into a variety of investment vehicles, like mutual funds. (*Id.* at ¶ 15). Each fund has an "expense ratio" that expresses the percentage of assets deducted each fiscal year for fund expenses. (*Id.* at ¶ 17). Expense ratios are often expressed in "basis points"; one basis point is one hundredth of one percent. (*Id.*). Each investment option has its own expense ratio, which is the composite of a fixed, Plan-level fee of 60 basis points and a variable, fund-level fee. (*Id.* at ¶ 30).

The Checksmart Plan offered a variety of investment options. The options fall into two general categories: having someone else choose your investments (the "Lifestyle Portfolios") or managing your investments yourself. Lifestyle Portfolio options are actively managed with the client only dictating their desired balance of risk and return; each Lifestyle Portfolio contains a blend of assets designed to meet the desired risk profile. Over 70% of the Checksmart Plan participants' assets are invested in Lifestyle Portfolios. (*Id.* at ¶ 20). Participants handling their own investments may invest in a variety of other funds, with names like "mid growth," "emerging markets," and "money market." (*Id.* at ¶ 20).

Bernaola alleges that he invested in the "JH LS Growth Active Strategy Portfolio," which is the second riskiest investment option among the Lifestyle Portfolio options. (*Id.* at ¶¶ 20, 22). Bernaola alleges that he didn't know the costs and performance of his investments "as compared

to other available alternatives for similarly-sized defined contribution plans." (*Id.* at ¶ 22). Bernaola alleges that the

> expenses associated with the investments in the [Checksmart] Plan are grossly excessive, because the investment options made available to the [Checksmart] Plan's participants, at all pertinent times, have been focused upon expensive and unsuitable actively-managed mutual funds without an adequate or appropriate number of passively managed and less expensive mutual fund investment options.

(*Id.* at ¶ 24).

Bernaola alleges that Defendants didn't offer Checksmart Plan participants an "appropriate compliment of passively managed mutual funds to render the investment options sufficiently diverse or reasonable." (*Id.* at ¶ 27). Bernaola goes on to describe how the expensive, actively managed funds "rarely ever do better than their alternative, passively managed counterparts." (*Id.*). Specifically, Bernaola points to a comparison of the performance of the Checksmart Plan's actively managed funds with an index fund which shows that over every benchmark, the index fund outperformed the actively managed funds. (*See id.* at ¶ 33). The upshot, Bernaola asserts, is that the Plan funneled 75% of the Checksmart Plan participant's money into actively managed funds, which increased fees without increasing returns. As Bernaola sees it, Defendants should have ensured that the Checksmart Plan paid reasonable and appropriate fees and shouldn't have continued to offer the under-performing and expensive actively managed funds.

The alleged ERISA violation in all of this is a breach of fiduciary duty, because ERISA fiduciaries have duties of loyalty and prudence to plan participants. More on the legal framework later. Alternatively, Bernaola asserts a claim for "liability for knowing breach of trust," (*Id.* at ¶¶ 46–48), which could extend liability to Defendants even if they aren't fiduciaries of the Checksmart Plan.

**II. Legal Standards**

If a plaintiff has laid out his claims in the pleadings, and those claims fail as a matter of law, Federal Rule of Civil Procedure 12(b)(6) authorizes the Court to dismiss those claims. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1005 (6th Cir. 2009). But plaintiffs don't need to prove their case at the pleadings stage; they need only to provide a complaint that "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007)). When determining whether a plausible claim exists, the Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007). After doing this, the Court will deny a motion to dismiss if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

"[D]ocuments attached to the pleadings become part of the pleadings and may be considered on a motion to dismiss. Fed. R. Civ. P. 10(c). In addition, when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." *Comm. Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007).

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "dispute about a material fact is 'genuine'. . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). But if the material facts aren't in dispute, the Court can enter judgment as a matter of law.

The Court applies the motion-to-dismiss standard to most of the discussion, but it applies the summary-judgment standard to the narrow issue identified for focused discovery in this Court's earlier order. (*See* Doc. 48).

**III. Discussion**

Bernaola's claims are foreclosed by ERISA's statute of limitations. The Court analyzes first Bernaola's breach-of-fiduciary-duty claim and then his knowing-breach-of-trust claim.

**A. The Statute of Limitations Bars Bernaola's Claim for Breach of Fiduciary Duties**

Defendants argue that Bernaola's claims are time barred by ERISA's statute of limitations. The statute says:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, *after the earlier of--*

> **(1)** six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or
>
> **(2)** three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

29 U.S.C. § 1113 (emphasis added). Defendants argue that Bernaola's claims are subject to the shorter three-year limitations period of subsection (2) and not the six-year period of subsection (1).

The question here is: when did Bernaola have "actual knowledge" of the alleged breaches of fiduciary duty? Two issues orbit around this question: (1) the nature of the alleged breaches of fiduciary duty; and (2) the definition of "actual knowledge."

How did Defendants breach their fiduciary duties to Bernaola? He alleges that Defendants

> failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plan with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters, would use in the conduct of an enterprise of a like character and with like aims. In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

(Am. Compl. at ¶ 44) (Count I). This language from the Amended Complaint does little more than regurgitate the fiduciary duties ensconced in the statute. *See* 29 U.S.C. § 1104(a). But the specific facts alleged in the Amended Complaint distill into this claim: Bernaola alleges that "Defendants have engaged in significant breaches of fiduciary duty by (a) failing to ensure that the Plan paid reasonable and appropriate fees, and (b) retaining these improper and imprudent investment options." (Am. Compl. at ¶ 35). In short, Bernaola alleges that Defendants chose and retained imprudent investments. How does he know they were imprudent? Because while charging higher fees than an index fund, each of the actively managed funds underperformed the index fund in every benchmark cited. (*See* Am. Compl. at ¶ 33). Bernaola asserts that Defendants could have discovered, "with the exercise of any modicum of reasonable diligence," that the Checksmart Plan was investing in poorly performing funds. (*Id.* at ¶ 35). If Defendants acted without reasonable diligence, they might have breached their fiduciary duties under 29 U.S.C. § 1104(a). That's the nature of the breach of fiduciary duty at issue here.

5

Now to the second issue: actual knowledge. "'Actual knowledge' means 'knowledge of the underlying conduct giving rise to the alleged violation,' rather than 'knowledge that the underlying conduct violates ERISA.'" *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 548 (6th Cir. 2012) (quoting *Wright v. Heyne*, 349 F.3d 321, 331 (6th Cir. 2003)). "For example, in *Tassinare v. American Nat'l Ins. Co.,* 32 F.3d 220, 222–224 (6th Cir. 1994), we held that a plaintiff's claim for breach of ERISA fiduciary duties was time-barred because the plaintiff did not file suit within three years after he sent a 'protest letter' to the Internal Revenue Service in which he complained about the defendant's conduct with regard to the underpayment of his pension benefits." *Wright*, 349 F.3d at 329; *see also Farrell v. Auto. Club*, 870 F.2d 1129, 1131 (6th Cir. 1989) (holding that reviewing documents "which allegedly prove[d] their claim" sufficed as "actual knowledge"). But "[a]ctual knowledge does not 'require proof that the individual Plaintiffs actually saw or read the documents that disclosed' the allegedly harmful investments." *Brown v. Owens Corning Inv. Review Comm.*, 622 F.3d 564, 571 (6th Cir. 2010) (quoting *Young v. Gen. Motors Inv. Mgmt. Corp.*, 550 F. Supp. 2d 416, 419 n.3 (S.D.N.Y. 2008), *aff'd on other grounds*, 325 F. App'x 31 (2d Cir. 2009)).

Synthesizing the two important issues, here's the question: did Defendants disclose how much each investment option charged in fees before July 14, 2016 (three years before Bernaola filed this lawsuit). Answering this question required facts, not just the pleadings. So, the Court converted part of Defendants' Motions to Dismiss into Motions for Summary Judgment by permitting limited discovery on one issue: whether the expense ratios for the various investment options offered by the Checksmart Plan were disclosed to Plaintiff before 2015. As it turns out, Defendants did disclose the expense ratios for the various investment options offered by the Checksmart Plan in 2012. Several pieces of evidence support this conclusion.

First, Defendants disclosed the expense ratios and performance data for each fund in a document entitled "Returns and Fees" that was part of an enrollment kit that Bernaola received before he enrolled in the Plan and selected his investment on August 28, 2012. (*See* Helterbrand Decl. at ¶ 7, Ex. 2 at 2, Doc. 50-1). Bernaola chose to invest 100% of his contributions into the John Hancock Lifestyle Growth Portfolio, which had an expense ratio of 107 basis points. (PageID 925). The Returns and Fees sheet showed that the fund Bernaola selected has a 10-year return of 5.97%. (*Id.*). As part of the enrollment kit, Bernaola signed the enrollment form, which con-

firmed his acknowledgement of the "fees and risks that relate to" the various investment options. (PageID 921).

Second, detailed information regarding the Plan's fees and expenses were mailed to Bernaola in 2012. Federal regulations require the Plan to send out disclosures, sometimes referred to as Summary Annual Report Notices, (or SAR Notices). (Helterbrand Decl. at ¶ 12; Sigmund Decl. at ¶ 6, Doc. 50-3). Defendants mailed Bernaola annual SAR Notices that disclosed the annual operating expenses for each of the funds offered by the Checksmart Plan. (*See* Helterbrand Decl. Ex. 8 at PageIDs 1044–47). Defendants' records indicate that they sent Bernaola the 2012 SAR Notice. (Helterbrand Decl. at ¶ 28, Ex. 12 at PageID 1182). Bernaola doesn't recall receiving the 2012 SAR Notice, but per the parties' Joint Stipulation, he cannot say that he didn't receive it. (Joint Stipulation at ¶¶ 7–9, Doc. 49).

Third, Bernaola received detailed, quarterly benefit statements, including one immediately following the fourth quarter of 2012. (Fu Decl. at ¶ 9; Fu Decl. Ex. 1 at 1, Doc. 50-5). These statements included Bernaola's account value, his personal rate of return, beginning and ending balances, projections for future income and investments, other investment options, a summary of charges and fees, and a warning that "[p]ast performance is no guarantee of future results." (*See* Fu Decl. Ex. 1 at 3). The quarterly statements referred Bernaola to John Hancock's website for "information related to the total annual operating expenses for each investment option." (Fu Decl. Ex. 1 at 5). Between August 2012 and July 2013, the website—which was available for Bernaola's use—included detailed fee information and past performance data for each investment option, including the expense ratios for each investment option. (Ritchie Decl. at ¶¶ 10–14, Doc. 50-6). Bernaola received the quarterly benefit statements. (Joint Stipulation at ¶ 7).

There is no genuine dispute that Bernaola knew or should have known the expense ratios for the various investment options offered to him by the Checksmart Plan. The Checksmart Plan disclosed the expense ratios to Bernaola in his initial enrollment kit, in annual SAR Notices, and on its website. Although Bernaola disputes whether he read the documents sent to him, for purposes of determining "actual knowledge" it doesn't matter whether he actually saw or read the documents that disclosed the information that forms the basis for his Complaint. *Brown*, 622 F.3d at 571. What triggers the statute of limitations is the plan's disclosure of that information to Bernaola.

7

Here, the Checksmart Plan disclosed to Bernaola the expense ratios for all the investment options by August 28, 2012. At that point, Bernaola had actual knowledge of the underlying conduct that gave rise to his alleged violations. *Wright*, 349 F.3d at 331. That means that the three-year statute of limitations on any potential excessive-fee claims ran by August 28, 2015, but Bernaola didn't file his claim until July 14, 2016. Bernaola's claim is late, and it's foreclosed by the statute of limitations.

Bernaola offers little resistance to this analysis, but he makes three arguments that his claim is not time barred: (1) this is a "process-based" claim, and since Bernaola had no actual knowledge of the process the Checksmart Plan used to select the investment options, his claim is not time barred; (2) actual knowledge of the imprudence of an investment is impossible to have until after the investment underperforms; and (3) even if Bernaola did have actual knowledge of a breach of fiduciary duty in 2012, ERISA imposes an ongoing duty to monitor, which means the Checksmart Plan was engaged in an ongoing breach of fiduciary duty until Bernaola filed the Complaint.

First, Bernaola argues that his is a "process-based" claim for which he still lacks actual knowledge. Bernaola argues that a "process-based claim" is a claim that an ERISA fiduciary didn't act prudently, which "requires consideration of both the substantive reasonableness of the fiduciary's actions and the *procedures* by which the fiduciary made its decision." *Fish v. Great-Banc Tr. Co.*, 749 F.3d 671, 680 (7th Cir. 2014) (emphasis added). Bernaola asserts that Defendants' process-based failure was their "failure to act prudently in evaluating, monitoring, and selecting . . . the . . . investment options offered by the Plan." (Pl.'s Resp. Opp'n to Checksmart Defs.' Mot. Dismiss at 6 n.6, Doc. 42).

But can Bernaola bring a process-based claim in the Sixth Circuit? *Fish* isn't binding on the Court, but it's worth analyzing its reasoning. But analyzing *Fish* requires a dive into ERISA's statutory environment.

Section 1104 defines the standard of care for fiduciaries; they must, among other things, discharge their duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B).

8

Section 1106 lists prohibited transactions. This section prohibits many types of transactions between a plan and a party in interest. *See* § 1106(a). A party in interest as to an employee benefit plan includes an employer if its employees are covered by the plan. § 1002(14).

Section 1108 grants certain exemptions from § 1106's list of prohibited transactions. One of those exemptions is for certain employer securities. § 1108(e). In short, § 1106's prohibition does not apply to a plan's acquisition of certain employer securities "if such acquisition, sale, or lease is for adequate consideration." § 1108(e)(1).

With that statutory framework in place, on to *Fish*. *Fish* stands for the proposition that an ERISA plaintiff can make an imprudence-in-process claim. In *Fish*, the Seventh Circuit held that analyzing a breach-of-fiduciary-duty claim under 29 U.S.C. § 1104 requires courts to consider the procedures that led to a fiduciary's decisions, not just whether the transaction was imprudent. 749 F.3d at 680 ("Whether an ERISA fiduciary has acted prudently requires consideration of both the substantive reasonableness of the fiduciary's actions and the procedures by which the fiduciary made its decision . . . . This is true when determining whether an act was prudent under the general standard of § 1104 and whether an otherwise prohibited transaction under § 1106 is saved by 'adequate consideration' under § 1108(e)."). But the line of cases the *Fish* court cited for this proposition all deal with § 1108, which permits otherwise prohibited transactions if they are supported by "adequate consideration." *See Keach v. U.S. Tr. Co.*, 419 F.3d 626, 636 (7th Cir. 2005) (analyzing process-based claim when determining whether "adequate consideration" existed); *Chao v. Hall Holding Co.*, 285 F.3d 415, 437 (6th Cir. 2002) (same); *Donovan v. Cunningham*, 716 F.2d 1455, 1465 (5th Cir. 1983) (same); *see also Eyler v. C.I.R.*, 88 F.3d 445, 454–55 (7th Cir. 1996) (analyzing adequate consideration in tax case). Essentially, the *Fish* court incorporates the adequate-consideration analysis under § 1108 into the breach-of-fiduciary-duty analysis under § 1104.

But when is the adequate-consideration analysis appropriate? Adequate consideration must be shown in cases where there's a chance of foul play in the transaction, like when a closely-held company sells its own stock to its employees through an employee-stock-ownership plan. *See* 29 U.S.C. § 1106(a)(1). In that circumstance, without the invisible hand of the market to determine the price of the stock, unclean hands may prevail. The Department of Labor has regulations identifying "two requirements for a transaction to be considered supported by adequate consideration: a substantive requirement that the value assigned reflect the fair market value of

9

the asset, and a procedural requirement that the fiduciary actually determine the value assigned in good faith." *Fish*, 749 F.3d at 680 (citing then-proposed DOL Reg. § 2510.3–18(b); 53 Fed. Reg. 17,632–33 (May 17, 1988)). Courts routinely apply these two requirements when determining whether adequate consideration is present under § 1106. *See, e.g.*, *Chao*, 285 F.3d at 437 ("When determining 'adequate consideration,' [the DOL Regulation] requires not only a determination of fair market value, *but also an examination of the process* that led to the determination of fair market value in light of § 404's fiduciary duties.") (emphasis added). And that makes sense, especially given the statutory definition of "adequate consideration": if an asset doesn't have a generally recognized market, the fair market value of the asset must be determined "in good faith by the trustee or named fiduciary." 29 U.S.C. § 1002(18). And analyzing "good faith" requires analyzing the process underlying the fiduciary's decision.

Here, the Court declines to incorporate the good-faith standard for determining adequate consideration under § 1108 into the breach-of-fiduciary duty analysis in § 1104. In *Fish*, the plaintiffs claimed that one transaction violated both § 1104 and § 1106, which explains why the Court analyzed whether adequate consideration was present. 749 F.3d at 680. But here, Bernaola doesn't bring a claim under § 1106, so the adequate-consideration analysis from § 1108 isn't relevant. *Fish* doesn't support Bernaola's process-based claim. The Court does not see a reason to use the adequate-consideration analysis from § 1108 for a breach-of-fiduciary duty analysis in § 1104 if a plaintiff is not challenging a specific transaction that would be otherwise prohibited by § 1106. The *Fish* court even cabined its holding on this point, confining it to "the case of an ERISA plan that invokes a § 1108 exception to a § 1106 prohibition." 749 F.3d at 687.

To summarize, for the three-year statute of limitation to apply, Bernaola need not have actual knowledge of the process by which the Checksmart Plan selected the various investment options, he need only have actual knowledge of the Checksmart Plan's investment options. In other words, knowledge of the Checksmart Plan's investment options is "knowledge of the facts or transaction that constituted the alleged violation." *Wright*, 349 F.3d at 330. The Court will not recognize Bernaola's claim as a process-based claim. Doing so would essentially erase the statute of limitations for all breach-of-fiduciary-duty plaintiffs - - none would be likely to have insider knowledge of their plan's decision-making process.

Second, Bernaola argues that even if his claim is not a "process-based claim," he could not have actual knowledge of Defendants' underlying conduct until 2016, when it became clear

to him that certain funds had underperformed and overcharged. Put another way, Bernaola couldn't predict the future in 2010, so he couldn't have had actual knowledge that the funds would underperform and thus charge fees outpacing their performance.

Bernaola is right: he can't be expected to predict the future. But the same goes for Defendants, and that's why this argument fails. Bernaola asserts that the Checksmart Plan offered investment options that charged exorbitant fees and performed poorly. Bernaola had access to the following information in 2012: the fees charged, the past performance of each investment option, the estimated risk profile for each investment option, and warnings that past performance didn't guarantee future results. Whether he read the documents containing this information doesn't matter. *See Brown*, 622 F.3d at 571. Neither side is expected to predict the future.

Furthermore, Bernaola's own allegations belie this argument. Bernaola alleges that "the Plan has paid grossly excessive fees during the pertinent period for extremely underwhelming performance." (Am. Compl. at ¶ 35). Bernaola also alleges that this was a fact that "Defendants could have discovered at the time each investment was made with the exercise of any modicum of reasonable diligence." (*Id.*). But Bernaola likewise had access to the year-to-year performance data for each of the investment options.

But, Bernaola argues that some courts reject this argument because a Plaintiff can't know that a plan-offered fund's fees are "excessive" unless the Plaintiff knows what other funds charge. *See, e.g.*, *Moreno v. Deutsche Bank Americas Holding Corp.*, No. 15 CIV. 9936 (LGS), 2016 WL 5957307, at *4 (S.D.N.Y. Oct. 13, 2016) (holding that the plaintiffs didn't have actual knowledge of a breach of fiduciary duty because they didn't know "the fee or performance data for the comparable alternative funds more than three years before the commencement of this suit."). In other words, "excessive" doesn't mean much without a benchmark.

According to this argument, for a plaintiff to have actual knowledge that his plan charged excessive fees, he needs to have knowledge of some comparator funds' fees by which to judge his own options. In *Moreno*, the court held that it wasn't "clear from the face of the Complaint or any judicially noticed court filings" that the plaintiffs had actual knowledge of a relevant comparator fund fee. *Id.* at *4; *see also Urakhchin v. Allianz Asset Mgmt. of Am., L.P.*, No. SACV 15-1614-JLS JCGx, 2016 WL 4507117, at *6 (C.D. Cal. Aug. 5, 2016) (Defendants did not "point to any judicially noticeable documents indicating that pre-2013 fees, expenses, or cost percentages of alternative plans were the same of lower than the 2013 or 2014 figures alleged in

11

the [First Amended Complaint.]"); *Leber v. Citigroup 401(k) Plan Inv. Comm.*, No. 07-CV-9329 SHS, 2014 WL 4851816, at *5 (S.D.N.Y. Sept. 30, 2014) ("Plaintiffs could not have known that the fees were excessive, and thus a basis for an ERISA claim, without the relevant comparison point for assessing excessiveness: fees for comparable funds.").

But these three cases have an important distinction - - the plans offered no genuine comparator funds. The plans in these cases offered funds that were proprietary, *Moreno* at *4, affiliated, *Leber* at *5 ("a comparison of the Affiliated Funds' fees with those of unaffiliated funds in the Plan would have given them 'notice that something was awry.'"), or were investments managed by plan subsidiaries, *Urakhchin* at *1 ("the only 'core' investment options offered within the Plan were investments managed by" the defendant's subsidiaries). In all three cases, the plaintiffs alleged that these proprietary or affiliated plans charged excessive fees when compared to funds that were not included in the plans. *Id.* But, in all three cases, the plaintiffs didn't appear to have access to comparator fund data until well after their initial investments were made.

Here, Bernaola alleges that the Checksmart Plan did offer some non-affiliated investment options, just not enough of them. (*See* Am. Compl. at ¶ 31 ("There are very few Vanguard index funds offered in the Plan, and the S&P 500 index mutual fund charges a grossly excessive (for an index fund) expense ratio of over 60 basis points."). Here, Defendants didn't offer only proprietary or affiliated funds like the defendants in *Moreno*, *Leber*, and *Urakhchin*. Here, the Checksmart Plan offered approximately fifty different funds to its participants. Some of the funds were not affiliated, not proprietary, and were not managed by a plan subsidiary. Therefore, Bernaola had access to true comparator funds when he received the list of investment options in 2012.

It's true that more than 70% of the Checksmart Plan participants' assets were invested in actively-managed John Hancock funds. (Doc. 38-1 at PageID 399). But the Checksmart Plan offered a wide array of investment options from financial entities like T. Rowe Price, Oppenheimer, Vanguard, and Franklin Templeton. (*See* Doc. 38-1 at PageID 400). The expense ratios for all these different funds were available to the Checksmart Plan participants when they made their investment decisions. Because the Checksmart Plan didn't limit the participants to only proprietary or affiliated funds, but instead gave them a menu of 47 different investment options from a wide variety of competitors in the marketplace, the reasoning behind *Moreno*, *Leber*, and *Urakhchin* doesn't apply here.

12

Bernaola also alleges that the Checksmart Plan had the wrong mix of funds, funneling most of the Checksmart Plan participants' assets into the actively managed funds that charged high fees and performed poorly. But participants were free to put their money where they wanted; there's no allegation that the Checksmart Plan forced or coerced its participants to put their money where they did. Absent such an allegation, Bernaola's claim that the Checksmart Plan had the wrong mix of funds fails.

Bernaola asserts one more argument why the statute of limitations should not apply. Bernaola asserts that "Defendants have a continuing duty to monitor the Plan's investment options, and their failure to remove imprudent investment options remains actionable year after year." (Pl.'s Resp. Opp'n to Checksmart Defs.' Mot. Dismiss at 8). Bernaola argues that this imprudence continues to this very day. Bernaola cites a Supreme Court case in support of this position. *See Tibble v. Edison Int'l*, 135 S. Ct. 1823, 191 L. Ed. 2d 795 (2015) (holding that "plaintiff may allege that a fiduciary breached the duty of prudence by failing to properly monitor investments and remove imprudent ones. In such a case, so long as the alleged breach of the continuing duty occurred within six years of suit, the claim is timely."). But that case analyzed ERISA's six-year statute of repose, § 1113(1), not the three-year statute of limitation that applies here, found in § 1113(2). The distinction between the two matters.

Here's the entirety of § 1113 for context:

No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

**(1)** six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or

**(2)** three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation.

29 U.S.C. § 1113 (Limitation of actions).

"[F]or claims subject to § 1113(2), the earliest date of actual knowledge of a breach begins the limitations period, even if the breach continues. When a plaintiff has actual knowledge of a breach, § 1113(2) operates to keep her from sitting on her rights and allowing the series of

13

related breaches to continue." *Tibble v. Edison Int'l*, 843 F.3d 1187, 1196 (9th Cir. 2016) (en banc) (decision after remand from the Supreme Court). And the Court agrees with the Ninth Circuit that it is "when a plaintiff does not have actual knowledge of a breach of a continuing duty [that] § 1113(1) applies." *Id.* But, as here, where the plaintiff has actual knowledge of the breach or violation, the three-year statute of limitations applies. *See id.* To apply "the continuing-violation theory to § 1113(2) would improperly supplant the plain language of the statute." *Muehlgay v. Citigroup Inc.*, 649 F. App'x 110, 112 (2d Cir. 2016) (summary order). That's because the statute of limitations says that "[n]o action may be commenced . . . after the earlier of" either subsection (1) or (2). § 1113. Bernaola's interpretation would eliminate "after the earlier of" from the statute.

Even if Bernaola asserts a continuing-breach-of-fiduciary-duty claim, if he had actual knowledge of the first violation, that's what started the clock.

Plaintiff had actual knowledge of almost everything in his Amended Complaint in 2012. Bernaola brings a breach-of-fiduciary duty claim, asserting that Defendants offered the wrong mix of investment options, the Checksmart Plan charged excessive fees for its investment options, the actively-managed funds charged excessive fees especially when compared to the passively-managed funds, most of the funds were imprudently invested into actively-managed funds, and the actively-managed funds underperformed a passively–managed S&P 500 index fund. But Bernaola had actual knowledge of all the facts underlying these claims more than three years before he filed this lawsuit. Therefore, Bernaola's claim for breach of fiduciary duties is foreclosed by the statute of limitations.

**B. Bernaola's Claim for Knowing Breach of Trust Likewise Fails**

In Count II, Bernaola asserts an alternative claim; a claim for equitable relief for knowing breach of trust. (*See* Am. Compl. at ¶¶ 46–48). Bernaola alleges that "to the extent that any of the Defendants are not deemed a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a breach of trust." (*Id.* at ¶ 47).

Defendants move to dismiss this claim, arguing that the Amended Complaint doesn't describe which of the four Defendants aren't fiduciaries, nor does it include pleaded facts to support the claim. But Bernaola pleads this as an alternative claim, which he may.

But to the extent that the Court has dismissed Bernaola's breach-of-fiduciary-duty claims, that ruling extends with equal force to Count II. Since the Court holds that the statute of limitations bars Bernaola's claim of an ERISA violation, Defendants could not have "knowingly participated in the conduct that constituted the violation.'" *Smith v. Aon Corp.*, No. 04 C 6875, 2006 WL 1006052, at *8 (N.D. Ill. Apr. 12, 2006) (quoting *Daniels v. Bursey,* 313 F. Supp. 2d 790, 808 (N.D. Ill. 2004)).

Therefore, Bernaola's claim for knowing breach of trust fails.

**IV. Conclusion**

Defendants' Motions to Dismiss and Motions for Summary Judgment are **GRANTED**. (Docs. 38, 39, 50, 51). The clerk is directed to enter judgment for defendants and close the case.

IT IS SO ORDERED.

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

DATE: July 12, 2018